Tussaud's Wax Museums, Inc., et al. [1] v. Commissioner. Tussaud's Wax Museums, Inc. v. Commissioner
Docket Nos. 1196-64, 2094-64, 2109-64. .
United States Tax Court
T.C. Memo 1966-211; 1966 Tax Ct. Memo LEXIS 76; 25 T.C.M. (CCH) 1081; T.C.M. (RIA) 66211; September 26, 1966
*76 1. Tussaud's Wax Museums, Inc., a Washington corporation, operated a wax museum at the Seattle World's Fair. The wax figures were leased by Edward R. Hicks and Donald R. Crysdale, both Canadian citizens and the majority and minority stockholders of Tussaud's, respectively, from the Stuberghs, a California corporation, and the figures were displayed by Tussaud's. A plan was devised by Hicks' Canadian solicitor whereby a Netherlands Antilles corporation would be formed to hold title to the wax figures and lease them to Tussaud's on a percentage royalty basis to avoid American and Canadian taxes on the royalty payments. A portion of the proceeds from the wax museum was transferred by Tussaud's to a trust account maintained by Hicks' Canadian solicitor and was deducted as royalty payments by Tussaud's. Some of these funds were subsequently disbursed from the trust account on the instructions of Hicks and/or to or for his benefit. Held, due to a dispute between Hicks and Crysdale the plan was not put into operation during the period here involved and the purported royalty payments are not deductible by Tussaud's in an amount greater than that allowed by respondent. 2. Held, Tussaud's is *77 not entitled to a bad debt deduction for the year involved for amounts advanced to Edward R. Liersch. 3. Held, a portion of the rental paid by Tussaud's for use of a house in Seattle occupied by the Hicks and Crysdale families and used in part as an office for the business constitutes an ordinary and necessary business expense of Tussaud's; the balance was for personal living expenses of Hicks and Crysdale. 4. Held, amounts paid by Tussaud's to domestics employed by the corporation's shareholders are not deductible by Tussaud's. 5. Held, depreciation, expenses, and costs of operating automobiles used for the personal benefit of Hicks and Crysdale are not deductible by Tussaud's. 6. Amount of deductible expenses incurred by Tussaud's for travel and publicity determined. 7. Hicks received funds from Tussaud's, and the advances were charged as loans to a drawing account. Held, the advances were in reality payment or compensation for services rendered and constitute taxable income to Hicks in the year received. 8. Held, distributions by Tussaud's to or for the benefit of Hicks and his wife, Irene Hicks, constitute taxable income received by them in the year involved. 9. Held, petitioner *78 Hicks is not liable for an addition to tax under section 6653(b). Held, further, petitioners Hicks and Irene Hicks are liable for additions to tax under section 6654(a). Held, further, petitioner Irene Hicks is liable for an addition to tax under section 6651(a). Held, further, petitioner Irene Hicks is not liable for an addition to tax under section 6653(a). 10. Held, petitioner Tussaud's is not liable for an addition to tax under section 6653(b). George Constable, Fourteenth Floor, Norton Bldg., 801 Second Ave., Seattle, Wash., and Gerhardt Morrison, for the petitioners. Richard H. M. Hickok, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated cases respondent determined deficiencies in income tax and additions to tax as follows: Additions to tax, I.R.C. 1954
Docket No.
Petitioner
Year
Deficiency
Sec.
Sec.
Sec.
Sec.
6651(a)
6653(a)
6653(b)
6654(a)
1196-64
Tussaud's
FYE
$71,473.23
$35,736.62
Wax
Feb.
Museums,
28,
Inc.
1963
2094-64
Irene
1962
1,294.28
$323.57
$64.71
$ 36.25
Hicks
2109-64
Edward R.
1962
38,870.59
18,435.30
1,032.38
Hicks
The issues for decision with respect to Tussaud's for its fiscal year ending February 28, 1963, and with respect to the individual *79 taxpayers for the calendar year 1962 are: (1) Whether $118,844.55 of the amount claimed by petitioner Tussaud's Wax Museums, Inc. (referred to herein as Tussaud's), as a royalty payment for the use of wax figures is an allowable deduction. (2) Whether $8,104.53 claimed by Tussaud's as a deduction for bad debts is an allowable deduction. (3) Whether $3,750 claimed by Tussaud's as a deduction for rent is an allowable deduction. (4) Whether $1,084 claimed by Tussaud's as a deduction for repairs and maintenance is an allowable deduction. (5) Whether $2,808.07 claimed by Tussaud's for expenses of an automobile is an allowable deduction. (6) Whether $6,069.99 claimed by Tussaud's as a deduction for travel expenses is an allowable deduction. (7) Whether $13,916.78 paid by Tussaud's to or for the benefit of Edward R. Hicks (hereinafter referred to as Hicks), and charged to a drawing account maintained by Tussaud's, constitutes taxable income to Hicks. (8) Whether Hicks received $40,346.83 and his wife, Irene Hicks (hereinafter referred to as Irene), received $4,999.60 as constructive dividends from Tussaud's, taxable as ordinary income; and whether Hicks and Irene realized long-term capital *80 gain on distributions from Tussaud's in the amounts of $40,767 and $5,095.88, respectively. (9) Whether Irene is liable for additions to tax under sections 6651(a), 6653(a), and 6654(a), I.R.C. 1954, [2] and whether Hicks is liable for additions to tax under sections 6653(b) and 6654(a). (10) Whether Tussaud's is liable for additions to tax under section 6653(b). General Findings of Fact Petitioners Edward R. and Irene Hicks were husband and wife and citizens of Canada during the year 1962, and neither of them filed a U.S. income tax return for the calendar year 1962. Tussaud's filed a U.S. corporation income tax return for the period March 17, 1962, to February 28, 1963, with the district director of internal revenue, Tacoma, Wash. Hicks, prior to the year 1962, lived in Vancouver, British Columbia, Canada, and actively engaged in various business enterprises in that area. In 1961, Hicks became interested in the possibility of establishing a wax museum in Seattle, Wash., to operate during the Seattle World's Fair. Donald R. Crysdale (hereinafter referred to as Crysdale) resided in Victoria, British *81 Columbia, Canada, prior to the year 1962 and was a citizen of Canada. In 1961 Crysdale also became interested in the wax museum venture and he and Hicks entered the United States in that year for the purpose of forming Tussaud's. Tussaud's was incorporated in the State of Washington on December 14, 1961, by Hicks and two attorneys. The authorized capital of Tussaud's consisted of 10 shares of stock and on January 31, 1962, 8 shares were issued to Hicks, 1 share to Irene, and 1 share to Crysdale. Hicks became president; Irene, vice president and treasurer; and Crysdale, secretary, of Tussaud's. The articles of incorporation for Tussaud's were general in nature and provided for the conduct of business in the United States and in foreign countries. Issue 1. Validity of Tussaud's Royalty Payment Deduction Prior to October 29, 1961, Hicks began negotiating with the Stuberghs, [3] a manufacturer of wax figures in California, concerning the leasing of wax figures to be displayed at the Seattle World's Fair. The Stuberghs submitted a proposed lease agreement dated December 6, 1961, to Hicks, but this agreement was never executed. After further negotiations between Hicks and the Stuberghs, an *82 agreement was executed on or about February 8, 1962, [4] whereby Hicks and Crysdale, as individuals, agreed to lease certain wax figures from the Stuberghs. These wax figures, consisting of 13 figures representing "The Lord's Last Supper" and 41 additional likenesses of historical and motion picture personalities, were to be displayed at the Seattle World's Fair, which was to open in the spring of 1962, and the agreement provided for a total rental in the amount of $20,000, payable $5,000 on or before delivery of the figures with the balance to be paid in installments within 120 days after the opening of the display. The lease was to expire on October 31, 1962 (per stipulation), or November 1, 1962 (per the lease). The wax figures were displayed by Tussaud's at a museum or display room in the city of Seattle which opened March 17, 1962. On the corporation income *83 tax return filed by Tussaud's for its fiscal year ending February 28, 1963, it reported gross income in the amount of $333,430.29 as proceeds from the display of the wax figures and the sale of pictures and pamphlets. In April 1962 Hicks engaged a Canadian solicitor, R.A.C. McColl, to advise him as to the proper form in which to conduct the wax museum business. McColl decided that because Hicks and Crysdale were Canadian citizens and had only temporary permits to enter the United States it was advisable for them to conduct this venture in corporate form. Various alternatives were considered, and it was finally decided that a Netherlands Antilles corporation (to be called London Displays Co. N.V., hereinafter referred to as Displays, N.V.) would be formed and this corporation would purchase the wax figures from the Stuberghs and lease them to Tussaud's for a royalty which would be based upon a percentage of the gross receipts received by Tussaud's from the operation of the wax museum. However, McColl believed that Displays, N.V. would be subject to a tax on accumulated earnings in Curacao, Netherlands Antilles, unless these earnings were distributed, so it was decided that a Bahamian *84 corporation, to be called London Displays (Bahamas) Ltd. (hereinafter referred to as Displays, Ltd.), would be formed, with Hicks and Crysdale as its stockholders, as a parent corporation holding all of the capital stock of Displays, N.V. Funds received by Displays, Ltd. as distributions from Displays, N.V. would subsequently be routed to Hicks and Crysdale in Canada. Hicks was advised by accountants in Seattle, Wash., that royalty payments from Tussaud's to Displays, N.V. would not be subject to withholding for U.S. taxes because of the then-existing tax convention between the United States and the Netherlands, extended to include the Netherlands Antilles. Pursuant to these plans, McColl instructed the Trust Corporation of Bahamas, Ltd. (hereinafter referred to as Trust Corp.) to form both Displays, Ltd. and Displays, N.V. The registered office of Displays, Ltd. was to be located at the office of Trust Corp. in Nassau and its directors and officers were to be personnel of Trust Corp. The authorized shares of Displays, Ltd. were to be owned by Trust Corp. for the beneficial owners, Hicks and Crysdale. McColl instructed Trust Corp. that the voting stock of Displays, Ltd. should be *85 held 50 percent in trust for Hicks and 50 percent in trust for Crysdale, because he believed that a different percentage ownership might subject Hicks and Crysdale to liability for Canadian personal holding company tax. [5]
McColl further instructed Trust Corp. that after Displays, Ltd. was formed Displays, N.V. should be incorporated in Curacao, Netherlands Antilles, as a wholly owned subsidiary of Displays, Ltd., with the registered office of Displays, N.V. to be in Curacao. Subsequently these two corporations were formed. The articles of association for Displays, Ltd., dated May 8, 1962, were general in nature and included extensive provisions for powers and purposes. The deed of incorporation of Displays, N.V., dated May 8, 1962, was approved by ministerial decree of no objection on May 25, 1962, and Trust Corp. was appointed managing *86 director thereof. The wax museum at the Seattle World's Fair was opened by Tussaud's in the spring of 1962 and continued throughout the summer of that year. A dispute arose between Hicks and Crysdale over the proportionate stock interest each was to have in Displays, Ltd. Realizing that Hicks and Crysdale were at an impasse in their efforts to resolve this conflict, McColl decided that final arrangements between Displays, Ltd., Displays, N.V., and Tussaud's should not be completed until a settlement was negotiated between Hicks and Crysdale. Proceeds received by Tussaud's from operation of the wax museum were used in part to pay operating expenses and provide some working capital, the balance of its funds being transmitted to Russell & DuMoulin, the law firm in Vancouver in which McColl was a partner. It was agreed that until a more satisfactory arrangement between Hicks and Crysdale could be developed, Russell & DuMoulin would handle the funds received through its trust account. [6] From time to time Hicks would request that funds be made available for certain purposes, and McColl was usually responsible for the disbursement of funds. It is stipulated that during the period here involved *87 Russell & DuMoulin received a total of $141,000 from Tussaud's, as follows: Received by Russell & DuMoulin
Checks
No.
Date
Amount
179
Apr. 23, 1962
$ 10,000
218
May 15, 1962
1,000
265
June 14, 1962
10,000
290
July 5, 1962
10,000
366
July 20, 1962
25,000
612
Oct. 12, 1962
50,000
Total
Mar. to Dec. 1962
$106,000
867
Mar. 21, 1963
[1] 35,000
Total for period
$141,000 An examination of the trust acount ledger maintained by Russell & DuMoulin for the period May 2, 1962, through February 28, 1963, indicates that the greater part of the disbursements made from this account during the period were to Elizabeth *88 B. Hicks, mother of Hicks, for a total of $36,500; to Donald Hicks, brother of Hicks, $2,000; and to the Stuberghs, $5,400 on August 20, 1962, $10,000 on October 31, 1962, and $1,621.87 on February 4, 1963, for a total of $17,021.87. Most of the rest of the disbursements during the period, eight in number totaling $11,040.53, appear to have been made to or for the benefit of persons who had loaned money to Hicks to start the business and were made on the instructions of Hicks. No specific disbursements to either Displays, Ltd. or Displays, N.V. are reflected on the trust account during this period. It also appears from the trust account and the testimony of McColl that on occasions when McColl received checks from Tussaud's he would have a Canadian bank cash the checks, remit portions thereof to the Stuberghs or others, and credit the balance to the trust account. This appears to have occurred twice during this period where the stipulation and trust account show that Russell & DuMoulin received checks for $10,000 from Tussaud's on or about May 2 and July 9, 1962, but only $1,500 and $5,000, respectively, were credited to the trust account on those dates. Trust Corp. prepared a profit *89 and loss statement and a balance sheet for Displays, N.V. as of December 31, 1962. The profit and loss account for the period from incorporation on May 8, 1962, to December 31, 1962, disclosed the following: Income
Nil
Expenditure: Management fee
$163.33
Cables
4.36
Postage
1.82
Deficit for the period, carried to
balance sheet
$169.51
The balance sheet of Displays, N.V., as of December 31, 1962, reflected the following: ASSETS
Accounts receivable
$1,541.10
Incorporation expenses
458.90
$2,000
LIABILITIES
Accounts payable: Trust Corporation of Bahamas Ltd.
$ 169.51
Capital and deficit: Share capital -
Authorized: 100 shares of $100
each
$10,000.00
Issued: 20 shares of $100
each
2,000.00
Profit and loss account
(deficit)
(169.51)
1,830.49
$2,000.00
Trust Corp. also prepared a profit and loss statement and a balance sheet for Displays, Ltd. as of December 31, 1962. The profit and loss account for Displays, Ltd. for the period from May 9 to December 31, 1962, disclosed the following: Income
Nil
Expenditure: Management fee
$163.33
Registered office fee
81.67
Directors meeting
16.80
$261.80
Miscellaneous expenses -
Cables
18.74
Postage
2.68
Stationery
15.40
Other expenses
4.90
41.72
Deficit for the period, carried to balance
sheet
$303.52
The *90 balance sheet of Displays, Ltd. as of December 31, 1962, reflected the following: ASSETS
Cash at bank
$ 198.04
Investment in subsidiary company
2,000.00
Incorporation expenses
541.88
$2,739.92
LIABILITIES
Accounts payable: Trust Corporation of Bahamas Ltd.
$ 302.34
London Displays Co. N.V.
1,541.10
1,843.44
Capital and surplus: Share capital -
Authorized: 10 class A voting shares of [*] 1 each at $2.80
28.00
990 class B nonvoting shares of [*] 1 each at $2.80
2,772.00
2,800.00
Issued and fully paid: 10 class A voting shares of [*] 1 each at $2.80
28.00
Paid in capital surplus
1,172.00
1,200.00
Profit and loss account (deficit)
(303.52)
896.48
$2,739.92 The dispute between Crysdale and Hicks over the proportionate ownership of the stock of Displays, Ltd. that had developed earlier continued into 1963. Crysdale's attorney made demand upon Hicks for a full accounting of funds distributed by McColl to "Mrs. E. B. Hicks." In order to protect the interests of Hicks, whom he considered to be the beneficial owner of 90 percent of the enterprise although, for reasons heretofore stated, the stock of Displays, Ltd. had been issued in trust 50 percent for Hicks and 50 percent for Crysdale, McColl arranged to have Displays, *91 N.V. make a call on Displays, Ltd. for the unpaid part of the purchase price of its stock, and when the call was not met, Displays, N.V. took back its stock and subsequently sold it to Greensboro, Ltd., an existing but dormant Bahamian corporation, the stock of which was then issued in trust for the benefit of Hicks. The dispute between Crysdale and Hicks was ultimately settled as reflected in a "Settlement Agreement," dated May 21, 1963, executed by Hicks, Crysdale, Tussaud's, Displays, N.V., and Displays, Ltd. The agreement provided, among other things, that all parties agreed to release all claims against each other, Crysdale agreed to assign all his stock interests in Tussaud's, Displays, Ltd., and Displays, N.V. to Hicks (or to his nominees), and Hicks agreed to pay Crysdale $10,000. Thereafter Hicks continued in the wax figure display business as the beneficial owner of the stock of Greensboro, Ltd., which in turn owned all the issued stock of Displays, N.V., which in turn entered into leasing agreements with various independent wax museums operators who leased the wax figures from Displays, N.V. for display in their museums on a royalty basis. At or about the time Hicks and *92 Crysdale entered into the lease agreement of February 8, 1962, with the Stuberghs, they also talked to the Stuberghs about purchasing the wax figures. They planned to use the figures not only at Seattle but in other museums at other locations. On March 27, 1962, the Stuberghs wrote a letter to Hicks and Crysdale in which they offered to sell the Seattle show, exclusive of "The Lord's Last Supper" and a mechanical girl figure, for $26,200, and would apply 50 percent of the rent for the figures to be sold, or $6,550, on the purchase price. They also offered to sell other wax figures to Hicks and Crysdale. The balance of the purchase price was to be paid in monthly installments of about $1,500. The offer was to remain open until May 1, 1962. Discussions and correspondence with reference to the acquisition of the wax figures continued between the Stuberghs, Crysdale and Hicks, and McColl, throughout the summer of 1962 but no agreements were finalized or reduced to writing. In the course of this correspondence McColl referred to London Displays, N.V. as the purchaser. On or about October 31, 1962, McColl had $10,000 of a $50,000 check he had received from Tussaud's sent to the Stuberghs. *93 By letter of November 26, 1962, addressed to Hicks, the Stuberghs acknowledged receipt of the $10,000 check and indicated that they would apply it to his account, for rental of the figures beyond October 31 and/or to payment on the purchase price for the figures if and when an agreement of sale was prepared and executed. The Stuberghs also requested a financial statement from the prospective buyer, which was not sent to them. By letter dated December 6, 1962, Hicks wrote to the Stuberghs advising that the letter would "serve my full intention" to purchase the entire show and nine additional figures on terms as arranged in July. The letter also stated, "This purchase is to act in the interim to the finalization of the London Display agreement." The letter was signed "E. R. Hicks - Pres. & Chairman, Tussauds Wax Museums Inc." Apparently no formal agreement of sale was ever executed between the Stuberghs and Hicks or any companies owned or operated by him. Nevertheless, Tussaud's continued to display the wax figures in Seattle after October 31, 1962, under an informal agreement calling for payments of $1,500 per month. The Stuberghs prepared a conditional sales contract dated November *94 1, 1962, wherein their corporation, Showmasters Corp., agreed to sell to Hicks specified wax figures for a total sales price of $51,221.58, payable $10,000 down and the balance payable in monthly installments of $1,500 each beginning on February 1, 1963. The original of this contract was signed in behalf of the sellers but it was never signed by the buyer. Sometime in January 1963 the Stuberghs met with Hicks to discuss the contract. At Hicks' request the name "London Displays, N.V." was substituted for his name as buyer. The Stuberghs asked for proof of the existence of Displays, N.V. and for financial statements of the corporation, but these were never furnished to them. Nevertheless at some point of time the parties apparently agreed orally to carry out the terms of the conditional sales agreement. On several occasions during the early part of 1963 Hicks directed Russell & DuMoulin by letter to disburse sums of money from the trust account. Russell & DuMoulin received a letter dated March 22, 1963, which read as follows: Dear Sirs: - You are holding in trust moneys transmitted by ourselves to you in trust. I, as President of Tussaud's Wax Museums Inc., hereby direct you to pay the *95 sum of $15,000.00 (in Canadian dollars) to Mrs. Elizabeth Hicks. Yours very truly, TUSSAUD's WAX MUSEUM INC. Per: /s/ E. R. Hicks The ledger of the Russell & DuMoulin trust account reflects a disbursement of $15,000 to Elizabeth Hicks on March 22, 1963. Sometime after the settlement agreement between Hicks and Crysdale was executed, probably about July 1963, a formal written lease agreement between Displays, N.V., as licensor, and Tussaud's, as licensee, was executed. The agreement was backdated to May 8, 1962. It recited that the licensor owned certain wax figures and was desirous of entering into a franchise agreement with the licensee for the display thereof, and that it had the right to enter into this contract "subject to its purchase agreement with The Stuberghs." It granted the licensee the exclusive right to display the wax figures for a period of 5 years from March 17, 1962, for a royalty of 50 percent of licensee's gross receipts after first deducting $50,000. The licensee confirmed that it had been displaying the figures since March 17, 1962. On its U.S. Corporate income tax return for its fiscal year ended February 28, 1963, Tussaud's reported gross receipts from the museum *96 of $327,689.09 and income from the sale of pictures and booklets in the amount of $5,741.20, for total income of $333,430.29. It claimed deductions, including compensation to Hicks in the amount of $20,000 and "Wax Figurine Royalties" in the amount of $138,844.55, [7] totaling $316,023.75, reporting taxable income in the amount of $17,406.54. In his notice of deficiency issued to Tussaud's respondent disallowed $118,844.55 of the deduction claimed for royalties "because it has not been established that the amount in excess of $20,000 constitutes an ordinary and necessary business expense or was expended for the purpose designated." Opinion This first issue is whether Tussaud's is entitled to deduct, for its fiscal year ending February 28, 1963, the amount of $138,844.55 as royalty payments for use of the wax figures. Petitioners claim that Displays, N.V. was a viable corporation formed for the valid business purpose of owning wax figures for lease *97 to various displayers throughout the world, as planned by Hicks and Crysdale; that Displays, N.V. either entered into an oral agreement for the purchase of the wax figures displayed at Tussaud's or took over the Hicks-Crysdale lease of the figures from the Stuberghs early in the year 1962; that Displays, N.V. entered into an oral agreement with Tussaud's for the lease or sublease of the figures in return for a royalty of 50 percent of Tussaud's gross income over $50,000, which agreement was not reduced to writing until 1963 only because of the dispute between Hicks and Crysdale; and that McColl was acting as the agent of Displays, N.V. in receiving the royalty payments from Tussaud's. Respondent, on the other hand, claims that Displays, N.V. had no rights or title to the wax figures during the period here involved which would entitle it to royalties from Tussaud's for use of the figures; that there was no business purpose for the use of Displays, N.V. as owner or lessee of the figures except to avoid taxes; that McColl was the agent of Hicks and/or Tussaud's, and that Tussaud's apparently took over the Hicks-Crysdale lease of February 8, 1962, and may deduct as royalties only the *98 amount of the royalties required to be paid to the Stuberghs under the terms of that lease, or $20,000; and that the balance of the payments received by McColl from Tussaud's were distribution from Tussaud's to Hicks and Irene and taxable to them as such. On the evidence presented we must agree with respondent that during the period here involved, up to February 28, 1963, Displays, N.V. had no such interest in the wax figures displayed at Tussaud's which would justify Tussaud's in paying royalties to Displays, N.V. for use of the figures as an ordinary and necessary business expense, there was no existing agreement between Tussaud's and Displays, N.V., which required payment of royalties, and Tussaud's did not in fact pay royalties to Displays, N.V. during its fiscal year ending February 28, 1963. Had McColl's rather elaborate plan for operating the business been put into effect we would undoubtedly have a different problem to decide. But it is quite apparent from the evidence that the dispute between Hicks and Crysdale prevented the full activation of that plan during the period before us. The plan was not put into effect during that period either in form or substance - and we must *99 decide the tax results on what the situation actually was rather than what it might have been. Compare Roy C. Acuff, 35 T.C. 162, affirmed per curiam 296 F. 2d 725; Island Gas, Inc., 30 T.C. 787, 795. We have little reason to doubt that Displays, N.V. was formed for the purpose of owning or leasing wax figures and leasing them to others on a royalty basis, with whatever tax consequences might have followed. However there is no convincing evidence that it acquired any economic interest in the wax figures here involved during this period. On the other hand the evidence is convincing that it did not do so for good reason. Prior to the settlement of the dispute between Hicks and Crysdale, had Displays, N.V. received royalties it would have had to distribute them to Displays, Ltd. for tax reasons and at that time Crysdale would have had a claim to 50 percent of those royalties. This Hicks was not willing to permit and McColl, who had control of the situation, was certainly representing Hicks in his dispute with Crysdale. Consequently, McColl did not fully implement his plan until the dispute was settled. Displays, N.V. had no funds with which to either acquire or lease the figures. *100 While McColl's records indicate he was receiving funds for Displays, Ltd., and he testified that his handling of those funds was under the direction and control of Trust Corp., it is obvious that those funds were being disbursed on the instructions of Hicks, and primarily for the personal benefit of Hicks. The balance sheet and profit and loss statement prepared for Displays, N.V. as of December 31, 1962, by Trust Corp. reflected the receipt of no income and the ownership of little or no cash. There has been shown no correlation between the amounts paid by Tussaud's to McColl and any royalty payments called for in any agreement. After Crysdale's attorneys asked for an accounting of McColl's disbursements to Hicks' mother McColl required Hicks to reduce his directions for disbursement of the funds to writing. The only written document executed by or in behalf of any of the petitioners with relation to the wax figures prior to February 28, 1963, was the lease from the Stuberghs to Hicks and Crysdale dated February 8, 1962. There is no evidence whether this lease was orally assigned to Tussaud's or how Tussaud's obtained the right to use the figures. However, there is no question that *101 Hicks and Crysdale originally intended to operate the wax museum in corporate form and that Tussaud's was formed for that purpose, nor that Tussaud's did use the figures and earned the income here involved. Tussaud's also paid a part of the royalty due the Stuberghs under the lease directly to the Stuberghs. We can only assume that Tussaud's took over the obligations of the lessees under the lease. This is further supported by Hicks' correspondence with the Stuberghs in December 1962, in which he indicated that Tussaud's would lease or purchase the wax figures until the London Displays agreement could be finalized, and Hicks' letter to Russell & DuMoulin dated March 22, 1963, wherein he, as president of Tussaud's, directed Russell & DuMoulin to pay $15,000 of the funds it was holding in trust for Tussaud's to Elizabeth Hicks. We need not determine what the tax consequences might have been had McColl's plan actually been put into effect during the period here involved. We would need far more convincing evidence than has been presented that the plan was actually carried out in both form and substance before we could allow these payments as an ordinary and necessary business expense of *102 Tussaud's, particularly where Tussaud's operated the museum that earned the income and Displays, N.V. was obviously formed primarily for tax-avoidance purposes and was entirely inactive during this period. Based on the evidence as a whole we are also of the opinion that Tussaud's had the right to use the wax figures during the period here involved under the original lease from the Stuberghs and the subsequent oral arrangements made by Hicks for the continued use or purchase of the figures. Likewise Tussaud's was obligated to pay the royalties for use of the figures called for in the lease and agreements, which was $20,000 up through October 31, 1962, and $1,500 per month thereafter until a purchase agreement was finalized. When the latter occurred is not apparent from the evidence but we conclude that it was not finalized until after February 28, 1963. It is possible that in the final agreement some of the royalty payments were applied against the purchase price, but as of February 28, 1963, they were royalty payments, deductible as such. Issue 2. Tussaud's Bad Debt Deduction Findings of Fact Edward R. Liersch, a Canadian citizen and close friend of Hicks', loaned $6,000 to Hicks *103 and Crysdale in early 1962. The money was to be used for promotion of the display business, and part of the money was used to make the payments on the Stuberghs' lease. Hicks agreed that Liersch would receive $10,000 as repayment for the $6,000 loan. Liersch came to the United States to help with the establishment of the wax museum. On occasion Tussaud's disbursed funds to Liersch, or paid money for his benefit. From the period March 22, 1962, through February 23, 1963, Tussaud's paid the following amounts to or for the benefit of Liersch: Date
Check No.
Explanation and Payee
Amount
Mar. 22, 1962
121
Labor (cleaning) Liersch
$ 200.00
Apr. 25, 1962
182
Loan Liersch
200.00
Apr. 26, 1962
407
Due from Liersch, Liersch
100.00
May 11, 1962
Due from Liersch (from cash receipts)
151.00
May 11, 1962
207
Loan Liersch
200.00
May 31, 1962
Cash from till
200.00
June 30, 1962
Cash from till
194.22
June 30, 1962
Cash from till
340.00
July 7, 1962
321
Sears Roebuck due from Liersch
198.93
July 13, 1962
354
Cash loan due from Liersch
120.00
July 16, 1962
365
Cash loan due from Liersch
100.00
July 23, 1962
376
Sears Roebuck due from Liersch
11.38
July 27, 1962
388
Cash loan due from Liersch
125.00
July 31, 1962
398
Cash loan due from Ed Liersch
125.00
July 31, 1962
400
Cash loan due from Ed Liersch
100.00
July 31, 1962
399
M. Bigford due from Liersch
175.00
Aug. 7, 1962
426
Container Corp. of Am. due from Liersch
400.00
Aug. 7, 1962
427
Western Plastic Co. due from Liersch
1,664.00
Aug. 9, 1962
438
Ed Liersch
250.00
Aug. 9, 1962
440
Ed Liersch
350.00
Aug. 9, 1962
441
Ed Liersch
100.00
Aug. 15, 1962
465
KIRO
2,235.00
Aug. 15, 1962
466
Ed Liersch
489.00
Aug. 15, 1962
467
Ed Hicks for Ed Liersch
150.00
Feb. 23, 1963
Credit of $74.00
(74.00)
Total
8,104.53
*104 The $8,104.53 was charged on Tussaud's books and records to account No. 122, entitled "Due from Ed Liersch and others." On occasion Tussaud's loaned money to Hicks, Crysdale, and Liersch, and these advances from the company were used for living expenses by the recipients. Liersch received a letter requesting that he sign a note for the money he had received, but he did not execute such a note. No further demands were made of Liersch to repay the funds he had received. Tussaud's included the amount of $8,104.53 in the claimed deduction for bad debts on its U.S. income tax return for the period ending February 28, 1963. In the notice of deficiency issued to Tussaud's respondent determined that the claimed bad debt deduction "is disallowed because you have not established that you are entitled to such a deduction." Opinion The issue for decision is whether Tussaud's is entitled to a bad debt deduction in the amount of $8,104.53 for money paid to or for the benefit of Liersch, which money was allegedly not repaid within the taxable period in question. Tussaud's argues that the money was advanced to or for the benefit of Liersch, that it was not repaid, that demand of repayment was made *105 and was refused, and therefore the deduction should be allowed. Respondent argues that the disbursements were in satisfaction of Hicks' and Crysdale's obligation to repay $10,000 to Liersch in return for the $6,000 he loaned them in 1962, that Tussaud's was in effect discharging an obligation owed by Hicks and Crysdale, "and that Tussaud's could have collected these advances by suing Liersch and attaching the funds that Hicks owed Liersch." We believe respondent's determination that the bad debt deduction should not be allowed is proper, because there has not been adequate proof that the alleged loans were uncollectible. While it is true that a creditor is not required to resort to legal remedies to establish the worthlessness of a debt, the fact that he did not, with no facts establishing a reason for not doing so, is a matter for consideration. The Precision Machine Co., Inc., 4 B.T.A. 207. It is axiomatic that if Tussaud's is to be entitled to deduct the alleged bad debt, it has the burden of establishing that the debt was in fact worthless. The only evidence offered to show worthlessness was the testimony of Liersch that a demand was made of him to execute a note for the funds *106 he had received, and he refused to sign such a note. Apparently the reason Liersch refused to sign a note was because he believed he was entitled to offset the $8,104.53 against the money due him from Hicks and Crysdale. Hicks testified that a portion of the $10,000 due Liersch had been repaid, and that the balance was still due. Regardless of which view of the testimony we accept, it remains patently clear that the item was not properly deductible in the taxable period in question because there has been no showing that the debt could not be collected after reasonable demand had been made. Simply requesting that Liersch sign a note for the amount due, and his refusal to agree to such demand, is not sufficient proof that the debt was worthless. We sustain respondent as to this issue. Issue 3. Tussaud's Claimed Rent Deduction Findings of Fact At the beginning of the Seattle World's Fair hotels were booked up in advance and available living space was at a premium, and Hicks was not certain he would be able to retain the use of the hotel room that had previously served as an office. There was not adequate space in the museum building for a suitable office. After looking for suitable *107 space, Hicks, in April 1962, moved into a house located in Seattle owned by James W. Cawdrey, under a written lease in which Tussaud's was named as lessee. Hicks owed Cawdrey money for certain construction work done on the museum. The lease of the Cawdrey house was for 1 year, at a monthly rental of $500, and the lessor reserved the right to terminate the lease by giving 30 days' advance notice in writing to the lessee. The house was larger than Hicks wanted, but he moved in some secondhand furniture, and the house was occupied by the Crysdale family and the Hicks family. On occasions the house was used for entertaining. The house served as a headquarters for the business, with the dining room being used primarily for an office where books, papers, and files were stored. The garage section of the house was used for storing production items and for a heating apparatus. Cost of the house was less expensive than the hotel would have been, and the fact that it could be leased without an advance deposit was important to Hicks because at that time money was in short supply. The connection with the lease of the Cawdrey house Tussaud's paid the following amounts: Date
Check No.
Payee
Amount
Apr. 20, 1962
177
James W. Cawdrey
$1,000
June 28, 1962
280
James W. Cawdrey
1,000
Aug. 24, 1962
424
James W. Cawdrey
500
Oct. 29, 1962
Bank debit memo
James W. Cawdrey
1,250
Total
3,750
*108 For the fiscal year ending February 28, 1963, Tussaud's included the amount of $3,750 in the claimed deduction for rental expense on its U.S. income tax return for the period ending February 28, 1963. Respondent disallowed the $3,750 for the reason that it had not been established that the payments to Cawdrey constituted an ordinary and necessary business expense or were expended for the purpose designated. Ultimate Finding of Fact Part of the Cawdrey house was used as an office and storage space for the business conducted by Tussaud's, and $750 of the rent paid constituted an ordinary and necessary business expense. Opinion The issue presented is entirely a question of fact, and we have found as an ultimate fact that $750 of the $3,750 paid as rental for the use of the Cawdrey house was an ordinary and necessary business expense. Tussaud's claimed the entire rent paid as a deduction, and respondent disallowed the entire amount. The evidence reveals that the hotel room that had previously served as the business headquarters would not be available once the Seattle World's Fair began because the rent would be prohibitive. Additional office space was necessary, so it was decided that *109 renting the Cawdrey house would be a satisfactory solution. The Cawdrey house was larger than necessary for the regular business of Tussaud's, and consequently only a portion of the space was actually used for business purposes. The Crysdale family and the Hicks family lived in the house, and certainly the personal use of the house would not permit a deduction by Tussaud's (unless it was shown by clear and convincing evidence that it was directly related to, and was a legitimate expense of, Tussaud's business. Louis Greenspon, 23 T.C. 138. No such evidence was presented here. Section 262 of the Code [8] provides generally that no deduction shall be allowed for personal, living, or family expenses, and that section covers a major portion of the claimed deduction. However, we think it is clear that a portion of the rental expense should be allowed as a deduction because part of the house was used for business purposes of Tussaud's. Using our best judgment in the light of the evidence presented, we find that $750 *110 of the rent paid for use of the Cawdrey house was an ordinary and necessary business expense of Tussaud's. Cohan v. Commissioner, 39 F. 2d 540. Issue 4. Tussaud's Claimed Deduction for Repairs and Maintenance Findings of Fact For the period ending February 28, 1963, Tussaud's issued the following checks: Check
Date
No.
Payee
Amount
May 10, 1962
201
Maude Bakken
$ 200
June 4, 1962
229
Maude Bakken
234
July 1962
287
Kathy Krutezhy
100
July 1962
288
Maude Bakken
200
July 30, 1962
389
Kathy Krutezhy
100
July 30, 1962
412
Maude Bakken
200
Sept. 14, 1962
557
Maude Bakken
50
Total
$1,084
The above checks were charged on Tussaud's books and records to an account entitled "repairs and maintenance." Tussaud's deducted $2,699.67 on its tax return for repairs and maintenance which respondent disallowed to the extent of $1,084 because it had not been established that the amount in excess of $1,615.67 constituted an ordinary and necessary business expense or was expended for the purpose designated. Respondent also determined that the $1,084 was taxable income to Hicks. Maude Bakken and Kathy Krutezhy were employed to do housework and some cooking at the Cawdrey house while it was occupied by the Hicks and Crysdale families. On *111 occasions they also took care of their children. Opinion It is clear from the evidence that the work done by these two employees was predominantly for the personal benefit of the Hicks and Crysdale families. While it is possible that they may have spent some time cleaning the dining room space used in part as an office, there is no direct evidence that this was so and, at most, it would appear to have been incidental. Furthermore there is no evidence from which we could even attempt an allocation. The amounts paid to these two employees were payments of personal expenses of Hicks and Crysdale and are not deductible as business expenses of Tussaud's. It would appear that some of this expense was for the benefit of the Crysdales and hence should not all be charged as additional income to Hicks. However, Hicks made the arrangements and was responsible for having the corporation pay the employees and we believe should be accountable for a larger part of the payments than Crysdale. The parties should be able to work out a reasonable allocation of the amount between Hicks and Crysdale in the Rule 50 computations. Issue 5. Tussaud's Claimed Automobile Expense Deduction Findings of Fact *112 On May 3, 1962, Tussaud's leased a 1962 Lincoln Continental four-door sedan from the First National Auto Lease Co. The lease was for a period of 2 years, with an initial payment of $417, a monthly payment of $312 for the first 8 months, and payments of $210.60 monthly for the period running from the 9th through the 24th month. The agreement also included a provision for public liability insurance. Because the wax museum business was not well established, and the financial position of Tussaud's was not strong, Hicks believed that leasing an expensive car would create an appearance of prosperity and might impress people favorably. This car was used by Hicks. The lease payments for the Lincoln Continental were included in the $2,535.18 deducted by Tussaud's as an "auto expense" on the return filed for the period under review. The cost of repairs, gas, oil, or other similar items paid for operation of this car were not included in the "auto expense" deduction claimed by Tussaud's. On December 30, 1962, Tussaud's purchased a 1962 Lincoln Continental sedan from Pay Less Car Co. in Seattle, Wash. The cash sales price of the car, including taxes and license, was $5,620, and Tussaud's received *113 a credit of $1,608, leaving a balance of $4,012 payable at $163.67 per month. This car was used by Hicks. The claimed deduction of $2,535.18 for "auto expense" included disbursements made in connection with the acquisition of this car. Tussaud's claimed a deduction on its tax return in the amount of $108 for the car license paid in connection with the purchase of the Lincoln Continental from Pay Less Car Co., and Tussaud's also claimed a deduction in the amount of $164.89 for depreciation of this automobile on the tax return filed for the period under review. Respondent disallowed all of these deductions. Opinion Tussaud's contends that it was necessary for it to have an automobile for use in its business, that the cars were used for business purposes, and that the deduction should be allowed. We agree with respondent's determination, because Tussaud's has not carried its burden of proving that the expenses claimed were proximately related to the wax museum business. The evidence indicates rather clearly that the automobiles were used for commuting between the Cawdrey house and the wax museum, and of course this would be a personal use, not deductible by the corporation. The contention *114 that one of these cars was used for Tussaud's business when Hicks, Liersch, and Crysdale traveled to California and to other areas looking for future sites for wax museums must be rejected as too remote and speculative. The indications are that if these three individuals were interested in finding new areas for expansion, it was for their own ventures, rather than for the corporation. The two automobiles were used by Hicks, and there is little or no evidence that they were necessary for the daily operation of the wax museum. Tussaud's argues inferentially that Hicks believed it was good business practice to have an expensive car parked outside the wax museum, apparently to impress people and give an appearance of financial stability to a business that, initially at least, was in a rather precarious financial position. Unfortunately there is no evidence that would support this theory. Perhaps Hicks was anxious to create an image of prosperity, thereby making it easier to personally raise additional capital, but this would be a benefit to a stockholder, not to the corporation. We doubt that any visitor to the wax museum would be motivated to go inside because he had noticed an "expensive *115 looking car" parked outside. To be entitled to these deductions Tussaud's must not only show that the expenses were not incurred for personal purposes of its stockholders, but also that there is a proximate - rather than merely a remote or incidental - relationship between the claimed expenses and Tussaud's business. This it has failed to do. Compare Robert Lee Henry, 36 T.C. 879. The cars were used by Hicks for his own personal use, and under the circumstances a deduction for these items is not allowable to the corporation. Issue 6. Tussaud's Claimed Travel Expense Deduction Findings of Fact For the taxable period in question Tussaud's claimed a deduction in the amount of $6,069.99 for "travel expense." Nineteen checks totaling this amount were drawn by Tussaud's payable to (1) the New Washington Hotel, (2) Hicks, (3) the Stuberghs, (4) petty cash, and (5) "Doric Mayflower," over the period from February 21, 1962, to February 28, 1963. The New Washington Hotel expenses in the early part of 1962 were, in part, payment for use by Hicks and Crysdale of the hotel room in Seattle. The hotel room was rented on a monthly basis, and was used in part as an office in which they kept the records, *116 files, books, and plans necessary for conducting the wax museum business. A check in the amount of $1,000 payable to the Stuberghs was drawn to pay for the Stuberghs' traveling and living expenses while they were in Seattle to help prepare the show prior to the beginning of the World's Fair. Other items charged to travel expense included the cost of hotel rooms occupied by Hicks and his wife, or Crysdale; the cost of a trip by Hicks, Crysdale, and Liersch to California; and for a trip by Hicks and his wife to Hawaii for about a week or 10 days. Tussaud's did not have a strong credit rating at the time the Seattle World's Fair opened, and occasionally it was necessary to cash a check at the New Washington Hotel in order to obtain cash. On one occasion, when the wax museum first opened, Hicks was engaged in a publicity stunt that was intended to help promote the wax museum and generate newspaper, radio, and television publicity. Hicks went to Los Angeles and picked up a wax figure resembling Napoleon Bonaparte, and returned to Seattle by plane with the wax figure occupying the adjoining seat. The subsequent landing of the plane, together with Hicks carrying the wax figure down the gangplank, *117 resulted in extensive coverage by the local news media. Ultimately the wax figure of Napoleon Bonaparte was placed in the wax museum as part of the regular display. The cost of the plane ticket and expenses for this publicity stunt was $300, which amount was included in the deduction for "travel expense." In the notice of deficiency issued to Tussaud's, respondent disallowed the $6,069.99 claimed as a deduction for "travel expense." Respondent determined that the deduction was unallowable because it had not been established that it constituted an ordinary and necessary business expense, or was expended for the designated purpose. Ultimate Finding of Fact Tussaud's incurred ordinary and necessary business expenses for travel and publicity in the amount of $2,000. Opinion The question presented with respect to this issue is primarily a question of fact, and we have decided, after considering all of the evidence presented, that Tussaud's did incur some expenses that were directly or proximately related to the conduct of its business, and therefore some deduction for these expenses should be allowed. Cohan v. Commissioner, supra. The evidence clearly shows that Hicks did engage in *118 a publicity stunt at the opening of the wax museum, when the wax figure of Napoleon Bonaparte was flown to Seattle, the cost of which is included in the amount claimed on the return filed. Furthermore, Tussaud's paid some of the Stubergh's expenses at the time they were in Seattle to assist in opening the wax museum. We believe both of these items constitute an expense of doing business and a deduction for tax purposes is proper. It would also appear that a part of the rent for the hotel room used in part as an office in the early part of 1962 was a deductible business expense of Tussaud's. As to most of the items claimed, however, we believe the money was used for the personal expenses incurred by Hicks, Crysdale, and Liersch. There was no adequate proof that the trip to Hawaii by Hicks and his wife was in any way connected with the business conducted by Tussaud's or what the expenditures were. Likewise, as previously noted, it would appear that the trip to California taken by Hicks, Crysdale, and Liersch, ostensibly to look for new museum sites, was for their own benefit rather than for the benefit of Tussaud's. Petitioners' own evidence and arguments on the first issue indicate *119 that there was no plan to have Tussaud's engage in business elsewhere. In any event Tussaud's has the burden of proving how much it is entitled to deduct as ordinary and necessary business expense. Considering the evidence as a whole in the light of this principle we find that Tussaud's is entitled to deduct the amount of $2,000 as travel expense and publicity costs for the period under review. Issue 7. Inclusion of Drawing Account Funds in Hicks' Income Findings of Fact During the period February 2 to December 19, 1962, Tussaud's paid out by checks the total sum of $13,916.78 to or for the benefit of Hicks. These checks were reflected on Tussaud's books and records as an account receivable from Hicks. An account captioned "Due from Officer - Ed Hicks" indicates that debits and credits for various amounts were made by Tussaud's during the period under review for Hicks and Crysdale. Because they did not obtain permits to enter the United States for the purpose of going into business, Hicks and Crysdale were advised that they could not draw salaries for services performed in the United States. They therefore agreed not to draw formal salaries from Tussaud's but instead to have Tussaud's *120 advance them money in the form of loans from time to time to pay their living expenses. These advances were considered to be loans from Tussaud's that would subsequently be repaid. Subsequently, Hicks was advised by his accountants that Tussaud's should accrue a lump-sum salary of $20,000 for Hicks, which amount would be credited against the amount Tussaud's had advanced to Hicks. Appropriate entries to reflect this action were made on the corporate books and records apparently sometime after the end of the year 1962 and near the end of Tussaud's fiscal year ending February 28, 1963. [9] On the corporation income tax return for the taxable year beginning March 17, 1962, and ending February 28, 1963, Tussaud's claimed a deduction for "Compensation of Officers" in the amount of $20,000, which respondent has allowed. On Schedule E of the return the name and address *121 of the officer listed as receiving the compensation was "Edward R. Hicks, Victoria, B.C." In the notice of deficiency issued by respondent to Hicks for the taxable year ended December 31, 1962, it was determined that Hicks "had income from salary for services rendered which [he] * * * failed to report on an income tax return." Accordingly, respondent increased Hicks' taxable income in the amount of $13,916.78. Opinion Hicks contends that the decision to accrue a salary for him and credit it against his advances was not made until 1963, that the advances to him were bona fide loans to him during 1962, and that the salary accrued to him was taxable to him in 1963 rather than 1962. We do not have Hicks' tax year 1963 before us in this case. The evidence is not clear on just what the arrangements were for payment of compensation to Hicks and Crysdale. There seems to be little doubt that Hicks thought he could not draw a regular salary for services performed in the United States while the advances were being made. On the other hand there is evidence that Hicks and Crysdale agreed between themselves that each would draw about $1,000 per month from the corporation to cover their living expenses. *122 The advances to Hicks or for his benefit were not made in even amounts or at regular intervals. A number of the checks were made payable to others to whom Hicks owed money. But regardless of the form of the payments or the thinking of Hicks and Crysdale with respect thereto, it is clear that the amounts were paid to or for them by the corporation because of either their services rendered to the corporation or their ownership of the corporation, the former being more likely because of the difference in the amount of stock owned by each. Although Hicks testified that as of December 31, 1962, it was their intention to pay back the advances, there is no evidence that either Hicks or Crysdale ever actually repaid the corporation anything on the advances or had any source of funds other than the corporation from which they could have repaid the advances. The balance of the amount due from Crysdale was apparently written off on the corporate books as a bad debt on February 28, 1963, despite the fact that Hicks later agreed to pay Crysdale $10,000 in settlement of their dispute. The amounts advanced to Hicks were recorded in the corporate books as amounts due from Hicks. However, there was *123 a specific reason for not recording them as salary - and we are not bound by the caption of the account in the corporate records. There was no evidence that the advances were to be repaid at any particular time and no interest was charged despite the fact that the advances were made over a period of a full year. While there is merit in petitioners' argument that the income should not be charged to Hicks until the debt was forgiven or his account was credited with the salary in 1963, we are just not convinced that a bona fide debt ever existed which Hicks intended to repay. The bookkeeping entries were simply an accounting of the funds advanced to Hicks, which had to be recorded in some account other than salary. It is our conclusion that the advances made to Hicks in 1962 were in reality payment or compensation for services rendered by Hicks to the corporation in 1962 and are taxable to Hicks in 1962. Issue 8. Whether Distributions by Tussaud's to McColl During 1962 Constitute Ordinary Income and Capital Gain Taxable to Hicks and His Wife in 1962 Findings of Fact Tussaud's paid various sums for expenses that were due and payable in the calendar year 1962. Included in these payments *124 were several items discussed in Issues 3, 4, and 5, above. Funds were also transferred from Tussaud's to the trust account maintained by Russell & DuMoulin as discussed in Issue 1, above, and a portion of these funds were subsequently disbursed to or for the benefit of Hicks and his mother. In the notice of deficiency issued to Hicks for the taxable year ended December 31, 1962, respondent determined that $40,346.83 of the amount distributed by Tussaud's was taxable to Hicks as ordinary income from dividends, and that Hicks realized long-term capital gain in the amount of $40,767. In the notice of deficiency issued to Irene for the taxable year ended December 31, 1962, respondent determined that $4,999.60 of the amount distributed by Tussaud's was taxable to Irene as ordinary income from dividends, and that Irene realized long-term capital gain in the amount of $5,095.88. Opinion The question presented is whether funds distributed by Tussaud's during 1962 are taxable in part as ordinary income, and in part as capital gain, to petitioners Hicks and his wife. In the notices of deficiency, respondent computed the extent to which distributions from Tussaud's constituted dividend distributions, *125 and what portion of the distributions constituted a realization of long-term capital gain. Neither party discusses this issue at length on brief, and it is apparently acknowledged by both Hicks and his wife that to the extent we find that Tussaud's paid expenses that were personal expenses of theirs, and therefore were not deductible by Tussaud's as ordinary and necessary business expenses of the corporation, these amounts would necessarily be dividend distributions to Hicks and his wife, limited only by the size of Tussaud's earnings and profits. Of course, Hicks and his wife have joined with petitioner Tussaud's and argued that the payments for the automobile, travel, repairs, maintenance, and rent were properly deductible by the corporation. But we have found above that a portion of these payments did not constitute allowable deductions, and therefore it would appear that they are taxable to Hicks and his wife, according to their respective stock interests in Tussaud's, as adjusted to reflect our findings above and limited to the extent that Tussaud's had available earnings and profits which would permit a dividend distribution. See sec. 316. Although it is true that no formal dividend *126 was declared, and the payments were not distributed pro rata, nevertheless petitioners Hicks and his wife received and used the money, or were the beneficiaries of the money paid, and therefore the payments can be a dividend for tax purposes. 58th Street Plaza Theatre, Inc., 16 T.C. 469, 475-477, affd. 195 F. 2d 724. The distributions from Tussaud's to the trust account maintained by Russell & DuMoulin also were subsequently distributed to or for the benefit of Hicks. We found in our consideration of this item in Issue 1, above, that the alleged royalty payments to McColl did not constitute an ordinary and necessary business expense of Tussaud's, that the distribution of funds by Tussaud's to McColl was part of a plan to divert income from Tussaud's to Displays, N.V. and eventually to Hicks free of U.S. taxes, which plan did not fully materialize during the period before us, and that during this period, at least, McColl was the agent of Hicks in receiving and disbursing these funds. It therefore follows that to the extent these distributions were not used to pay ordinary and necessary business expenses of Tussaud's, they are similarly taxable to Hicks and his wife. United States v. Pfister, 205 F. 2d 538, 540. *127 There is no evidence that Crysdale, the only other stockholder of Tussaud's, received any part of these distributions during the year 1962. Irene does not argue that she did not receive dividends in the amount attributed to her by respondent in the notice of deficiency. In any event, she has not offered any evidence on the point and certainly she has not met her burden of proving that respondent's determination was in error, except to the extent that adjustments might have to be made as a result of our decisions on the other issues in this case. Any distributions from Tussaud's to or for the benefit of Hicks and his wife in excess of the available earnings and profits have been determined by respondent to result in the realization by Hicks and his wife of long-term capital gain. Neither Hicks nor his wife disputes this categorization of the distributions by respondent; they only challenge the initial determination that the distributions were not ordinary and necessary business expenses of the corporation. As noted above, we have found against petitioners as to this argument, and because the petitioners fail to assert that the treatment of these distributions was in error, we find *128 that the method utilized by respondent in the notice of deficiency is proper in this case. The necessary adjustments required as a result of our conclusions with respect to the issues discussed above will be made in the Rule 50 computations. Issue 9. Liability of Hicks and Irene for Additions to Tax Findings of Fact When Hicks inquired at the American consulate about entry into the United States for purposes of entering into the wax museum business there was no discussion about how long he was to work in the United States. After the wax museum was established Hicks lived in the Cawdrey house in Seattle, and his wife joined him there. At times Irene would help with the business. At or about the time the wax museum was opened, Hicks consulted McColl concerning how best to operate the business with the greatest savings in taxes. McColl recommended the use of the offshore corporations as discussed above. McColl was not certain whether Tussaud's would be liable for withholding taxes, and he requested that advice on this issue be obtained from tax consultants in the United States. Hicks and Crysdale sought the advice of competent certified public accountants in the United States concerning *129 the liability of Tussaud's for withholding taxes, and were advised that if the plan devised by McColl was carried out, Tussaud's would not be required to withhold taxes on the royalties paid to Displays, N.V. Hicks, who had been advised that he could not draw a salary from Tussaud's for services performed in the United States without a permit to enter the United States for business purposes, also sought the advice of accountants and lawyers in Seattle with respect to his personal tax liability. It appears that when consideration was first being given to the accrual of a salary to Hicks to offset against his drawings from Tussaud's, in late 1962, Hicks was advised that he should report the salary as taxable income on a U.S. tax return, but this advice was not followed because the salary was not accrued by Tussaud's until 1963. Neither Hicks nor Irene filed a U.S. income tax return for 1962. The transfer of funds from Tussaud's to the Russell & DuMoulin trust account was a part of the plan devised by McColl to avoid payment of U.S. taxes on a large part of the income from the museum. It was also a part of the plan that these funds would be available to Hicks and Crysdale in Canada after *130 being routed through Displays, N.V. and Displays, Ltd. In the notice of deficiency issued to Hicks, respondent determined that there was a deficiency in tax for the year 1962 and that an addition to tax for fraud in the amount of $18,435.30 was due under section 6653(b) and that an addition to tax in the amount of $1,032.38 for underpayment of estimated tax was due under section 6654(a). In the notice of deficiency issued to Irene, respondent determined that there was a deficiency in tax for the year 1962 and that additions to tax in the amounts of $36.25 under section 6654(a), $64.71 under section 6653(a), and $323.57 under section 6651(a), were due. Opinion Petitioners Hicks and Irene do not question that they are subject to U.S. tax on any income determined to have been received by them from Tussaud's in 1962. We have already determined that they both received distributions from Tussaud's in 1962 which were taxable to them as dividends and long-term capital gain and that Hicks received payments from Tussaud's that were taxable to him in 1962 as salary. There remains for decision the question of whether respondent erred in asserting the various additions to tax. We shall first consider *131 the additions to tax for Hicks. In asserting the fraud penalty under section 6653(b), [10] respondent has the burden of proving that a portion of the deficiency is due to a fraudulent intent to evade tax. See sec. 7454(a). We are convinced, after carefully reviewing all the evidence in this case, that respondent has failed to sustain the burden of proof. Hicks was a Canadian citizen who entered the United States for the purpose of engaging in the wax museum venture. He consulted several accountants and attorneys, and received advice from other professional advisers, concerning the best method of conducting the business in the United States, and at the same time reducing his liability for U.S. taxes to the minimum permitted by law. As we discussed in considering Issue 1, above, the elaborate plans conceived by Hicks, *132 McColl, and the others involved were never consummated during the period under review, and therefore the intricate scheme which was conceived for the purpose of minimizing U.S. tax liability never came into operation. But it is relatively clear that Hicks reasonably believed that the plans were being executed and that the planned operation was a legitimate method of avoiding personal tax liability to the United States. Without discussing the merits of the advice he received, we are inclined to believe his argument that there was no intent to fraudulently evade any taxes he admittedly owed the United States. See Charles C. Rice, 14 T.C. 503. Hicks was acting on the advice of people whom he regarded as competent counsel, and he acted in apparent good faith. The novel tax savings' plans were designed to avoid taxes, it is true. [11] But there is a critical distinction between avoiding tax liability on the one hand, and evading tax liability on the other. Respondent argues that Hicks intentionally *133 gave incorrect information to his advisers, and he was personally responsible for any items that were incorrectly reported or that were never reported. We do not find sufficient evidence in this record to support respondent's argument. It is true that we have found that the corporation paid personal expenses of Hicks which constitute taxable income to him and that payments to the two housekeepers were entered on the corporate books as repairs and maintenance. However, there is no evidence that Hicks knew or had reason to believe that the expenditures were not properly considered to be corporate expenses, or that Hicks directed that the entries be made in any particular account, and there is no evidence of any concealment of income or padding of expenses. We think it is clear that McColl was aware of the problems presented, and that the other tax advisers were cognizant of the arrangements then existing. We find that respondent has failed to establish that Hicks had the necessary intent to fraudulently evade taxes and conclude that no part of the tax deficiency owing by Hicks was due to fraud. The next question is whether Hicks is liable for the additions to tax under section 6654(a). *134 [12] That section provides generally for a 6-percent penalty for underpayment of estimated tax. Hicks has not offered any explanation as to why he did not file a return showing his estimated tax liability, although we assume he believed he was not liable for any U.S. taxes for that year. We have found that he is liable for taxes for 1962, and it necessarily follows that he should have filed the appropriate return and made payment of his estimated tax. We hold for respondent as to this item. With respect to the additions to tax determined by respondent to be due from Irene, it is clear that she is liable for the addition to tax under section 6654(a), underpayment of estimated tax, for the same reason her husband is liable for that penalty. *135 Irene unquestionably failed to file a return for 1962 and the addition to tax under section 6651(a) is due from her unless she has shown that such failure to file was due to reasonable cause and not due to willful neglect. The absence of willful neglect alone will not excuse the failure or avoid the penalty; the taxpayer must also show the presence of reasonable cause, West Virginia Steel Corporation, 34 T.C. 851, which Irene has failed to do in this case. There is no evidence that Irene consulted any tax advisers on whether she should file a U.S. income tax return for 1962. She may have thought that she had no income in 1962 that was taxable in the United States but, absent reliance on competent counsel, a taxpayer's erroneous belief that he had no taxable income that would necessitate the filing of a return has been held not to be reasonable cause. Eleanor C. Shomaker, 37 T.C. 192. We conclude that Irene is liable for the addition to tax under section 6651(a). Section 6653(a) provides that if any part of any underpayment of income tax is due to negligence or intentional disregard of rules and regulations, but without intent to defraud, a penalty of 5 percent shall be added to *136 the tax due. This penalty may be imposed where the delinquency penalty for failure to file a return is also imposed. Robinson's Dairy, Inc., 35 T.C. 601, affd. 302 F. 2d 42. Respondent's determination of negligence is presumptively correct and taxpayer has the burden of proving his determination to be erroneous. We have little or no direct evidence that Irene individually gave much consideration to whether she was receiving income that should have been reported on a U.S. income tax return. On the other hand we believe she was aware of McColl's plan which was designed to avoid liability of the stockholders of Tussaud's for any tax on the income of Tussaud's, and that she, like her husband, had reason to believe that the plan was in operation. The only income respondent has determined to be taxable to Irene was oneninth of the distributions made by Tussaud's to the Russell & DuMoulin trust account, being what respondent considered to be her proportionate share of the distributions as a stockholder of Tussaud's. There is nothing to indicate that she individually ever actually received any of these funds during 1962. On the record as a whole we believe there is sufficient evidence *137 that Irene was relying in good faith on the advice of the tax advisers that the distributions to the trust account did not constitute taxable income to her to overcome respondent's determination of negligence on the part of Irene. We conclude that Irene is not liable for the addition to tax under section 6653(a). Issue 10. Liability of Tussaud's for Addition to Tax for Fraud Findings of Fact Tussaud's filed a U.S. corporate income tax return for its fiscal year ended February 28, 1963, on which was reported all of its gross income for the period and on which it claimed numerous deductions based on its books and records. The return was prepared by a competent accountant from the books and records. The deficiency in tax determined by respondent to be due from Tussaud's results entirely from the disallowance of various deductions, primarily the distributions to the Russell & DuMoulin trust account, most of which have heretofore been discussed in this opinion. Respondent also determined that Tussaud's is liable for an addition to tax in the amount of $35,736.62 for fraud under section 6653(b). Opinion The burden of proof on this issue is on respondent, and respondent must prove by clear *138 and convincing evidence that the deficiency was due to a deliberate intent to evade taxes. This is basically a question of fact. Respondent relies on the same factors to prove fraud on the part of Tussaud's as he relied on to prove fraud on the part of Hicks. We discussed those factors under Issue 9 and concluded that they were not sufficient to prove fraud on the part of Hicks. We also conclude that they do not prove fraud on the part of the corporation. In addition to the factors discussed under Issue 9, here the corporation did file a return which was prepared by an accountant from its books and records. There is no claim that the corporation failed to record or report any of its income or that it deliberately falsified any of its expenses. The return apparently correctly reflected the information contained on the books and records. If, as we have determined, the corporation claimed deductions for expenditures which it was not entitled to deduct, we believe this was because of errors in judgment rather than a deliberate effort to evade taxes, for the reasons set forth in our discussion under Issue 9. We see no benefit in repeating them here. We conclude that Tussaud's is not liable *139 for the addition to tax under section 6653(b). To permit the parties to make the numerous adjustments in respondent's determinations that are required by our conclusions herein and to reach reasonable agreements with respect to some of the issues under the guidelines set forth herein, Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Irene Hicks, docket No. 2094-64; and Edward R. Hicks, docket No. 2109-64.↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
3. Reference to the Stuberghs includes companies known as the Stuberghs, Showmasters Corp., and individuals known as Tom Keller and Katherine Stubergh. ↩
4. Apparently this was the only formal, written agreement entered into by the Stuberghs with any of the petitioners or other parties mentioned herein during the period here involved.↩
5. The evidence is not entirely clear on the point, but apparently it was anticipated that at a later date the stock ownership of Displays, Ltd. would be varied so that Hicks would own 90 percent and Crysdale 10 percent of the stock of Displays, Ltd., which percentage ownership would be substantially similar to their relative stock interest in Tussaud's.↩
6. The ledger maintained by Russell & DuMoulin is captioned "London Displays (Bahamas), Ltd.," and McColl testified that for accounting purposes one master account was used, and "allocations would be made where other companies were involved." ↩
1. On Oct. 27, 1962, Hicks drew a check payable to the U.S. Internal Revenue Service on the account of Tussaud's in the amount of $35,000 which was recorded on Tussaud's books as a reserve for taxes. This check was not sent to the Internal Revenue Service and on Mar. 21, 1963, it was deposited to Tussaud's bank account, and on the same day $35,000 was transferred to Russell & DuMoulin.↩
7. The $138,844.55 is a figure computed by deducting $50,000 from gross admissions of $327,689.09 and dividing the balance by 2, and represents 50 percent of the gross receipts less $50,000, as called for in the lease agreement dated May 8, 1962.↩
8. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩
9. Documentary evidence indicates that a proposal to accrue salaries to Hicks, Crysdale, and Liersch was considered before the end of the year 1962 but was not actually decided upon until after the end of the year. The entry offsetting advances to Hicks with "Wages Payable" was entered on the corporate books as of Feb. 28, 1963.↩
10. SEC. 6653. FAILURE TO PAY TAX. * * *
(b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).↩
11. At the trial, when asked whether Displays, N. V. was formed for the purpose of avoiding Canadian and American income taxes, Hicks replied: "Everybody wants to avoid paying income taxes, yes."↩
12. SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX. (a) Addition to the Tax. - In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)).↩